THE BERLIN IRON BRIDGE COMPANY *vs.* THE AMERICAN
BRIDGE COMPANY.

First Judicial District, Hartford, May Term, 1903.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and RORABACK, Js.

The defendant purchased the plaintiff's plant and business, and agreed
to reimburse it for expenditures theretofore actually made by it
upon its uncompleted contracts, which the defendant assumed.
*Held* that the plaintiff's right of recovery was not limited to ex-
penditures made in the partial performance of such contracts, but
included expenses incurred by its engineering department in mak-
ing estimates, and the salaries and traveling expenses of its agents
while negotiating and securing the contracts.

These expenditures, charged as "contracting expenses," were not
given in detail, but were estimated, under a long-standing general-
average rule of the plaintiff, at five per cent. of the contract prices,
a method which the experienced officers of the plaintiff testified
was proper and necessary and led to substantially correct results.
Upon evidence of this character and tendency the trial court found
that the sums called for by these estimates were actually expended
by the plaintiff. *Held* that this conclusion, whether regarded as
one of law or of fact, was fully warranted.

Another item, charged by the plaintiff on its cost book under the head
of "pool expenses," was for sums paid by it to unsuccessful bidders
upon these contracts, under a mutual agreement that the successful

bidder should pay to each of the unsuccessful ones a certain percentage of the former's estimated profit. No question was made as to the validity of the "pool" agreement, or payments made thereunder, but the defendant contended that such payments were not covered by its promise of reimbursement. *Held* that such contention was not well founded.

The plaintiff guaranteed that the contracts turned over by it to the defendant would net the latter a clear profit of at least fifteen per cent. of the "shop cost" of performing them; and another clause declared that this term included "labor, material, and general shop expense, f. o. b. cars at works of the plaintiff." The trial court ruled that shop cost or expenses incurred elsewhere than at the works of the plaintiff in Connecticut and Pennsylvania were not to be included in determining the amount of the shop cost of the contracts assumed by the defendant. *Held* that this ruling was correct and in accord with the limited meaning which the parties themselves had seen fit to place upon these words.

Argued May 6th—decided July 24th, 1903.

ACTION to recover money claimed to be due under a contract, brought to the Superior Court in Hartford County and tried to the court, *Ralph Wheeler, J.;* judgment for the plaintiff for $32,860, and appeal by the defendant. *No error.*

*Charles E. Perkins,* for the appellant (defendant).

*William Waldo Hyde* and *Arthur L. Shipman,* for the appellee (plaintiff).

TORRANCE, C. J.   The Berlin Iron Bridge Company and two of its stockholders are named as plaintiffs in this case, but as in the trial court the corporation was treated as sole plaintiff it will be so treated here, and the word plaintiff as hereinafter used will mean said corporation.

The defendant is a New Jersey corporation.   In March, 1900, the plaintiff entered into a written contract (hereinafter called contract *A*) with one I. Gifford Ladd, in which it agreed, among other things, to sell and convey to him or his nominees or assigns, on or before May 1st, 1900, all its property and estate of every kind, and to go out of the bridge-building business.   Subsequently the defendant became the nominee or assignee of Ladd, and succeeded to all his rights

and became subject to all his obligations under said contract, and ultimately, in May, 1900, became the owner of all the property of the plaintiff.   As a part of said transaction the plaintiff and the defendant entered into certain written contracts, one dated May 11th, 1900, called hereinafter contract *B*, and one dated as of June 1st, 1900, hereinafter called contract *C*.

In these contracts the parties, among other things, agreed that the defendant should assume certain uncompleted contracts of the plaintiff, and should pay to it whatever money the plaintiff had actually expended thereon prior to May 12th, 1900; and the plaintiff guaranteed that the amount so expended by it was $305,682.95, which is hereinafter referred to as the " guaranteed sum."   The defendant agreed to pay ninety per cent. of said guaranteed sum upon certain conditions, and did so.   The remaining ten per cent. has not been paid, and to recover that, with interest, this suit is brought.

In the court below the defendant claimed that the plaintiff had charged in said guaranteed sum more than it was rightfully entitled to charge as against the defendant, and that by reason thereof the defendant, in paying said ninety per cent., had paid more than it was obligated to pay; and the case was, without objection, tried upon the assumption that the defendant had the right to make this claim and to have it tried and determined in the court below.   Whether in this case, and upon the pleadings therein, the claim thus made and tried was a permissible one, if proper objection to it had been made, may perhaps admit of some doubt; but under the circumstances we shall treat the case as court and counsel have heretofore treated it, namely, as one in which said claim was properly made.

The parts of said three contracts having any material bearing upon the questions in this case are the following : In contract *A* it was provided, in case of the consummation of the sale and purchase therein contemplated, that Ladd, or "his nominees or assigns," should assume the uncompleted contracts of the plaintiff upon a basis that would " net " to them " a clear profit in any event of not less than fifteen per centum

of the total shop cost of performing such contracts." In contract *B* the plaintiff guaranteed that said contracts would net to the defendant " a clear profit in any event of not less than fifteen per cent. of the shop cost of performing such contracts," and the parties agreed in said contract that " the term ' shop cost ' shall include labor, material, and general shop expense f. o. b. cars at works of the party of the first part." Contract *B* also provided that a certain committee, appointed therein with power to determine and appraise the value and profits of the contracts assumed by the defendant, should " within thirty days determine the value and probable profits of such contracts in its opinion." It further provided that if said committee should " certify that in its opinion such contracts will not net a clear profit of at least fifteen per cent.," then the plaintiff was to pay the defendant " in cash the estimated difference ; but any contract not so appraised and estimated by the committee shall be deemed to fully comply with the guaranty" of the plaintiff above specified. Contract *C* recited that the parties had agreed " to defer the valuation or appraisal " of the contracts assumed by the defendant, " and to provide for the payment of the expenditures represented to have been made thereon " by the plaintiff, " less a proportion thereof to be retained " by the defendant as thereinafter provided. It also contained this provision : that the plaintiff " represents and guarantees that the amount of expenditures actually made " by it " prior to May 12th, 1900," upon the contracts of the plaintiff assumed by the defendant, " after deducting any moneys received " by the plaintiff " on account of such contracts prior to said date, is the sum of $305,682.95 "; and a further provision that the defendant would pay ninety per cent. of said sum in three equal instalments on or before specified dates " provided the Bridge Company (the defendant) shall have on said dates respectively collected out of said contracts so assumed sufficient moneys to cover said payments." Contract *C* further provided that " the 10 per cent. balance shall be retained by the Bridge Company (the defendant) as a guaranty fund until the committee appointed " by contract *B* " shall certify

that in its opinion the said contracts so assumed will net to the Bridge Company an average clear profit in any event of at least fifteen per cent. of the total shop cost of performing the same, as guaranteed in said original agreement (*i. e.* in contract *B*), and thereupon shall be paid by the Bridge Company to the party of the first part (the plaintiff) as hereinafter provided. The said committee may determine and appraise the profits of such contracts, or any of them, either before or after the complete performance thereof." It further provided in effect that if the committee should not certify that the contracts assumed would net the guaranteed profit, and upon performance such contracts should not net such profit, or if the committee should certify that said contracts would not net the guaranteed profit, "specifying the amount of the appraised deficiency, then and in either event the amount of said guaranty fund so reserved shall from time to time be applied by the Bridge Company (the defendant) to the payment of any deficiency in such guaranteed profit of fifteen per cent. resulting from the performance of such contracts, or so determined by said committee. Any surplus of such guaranty fund thereafter remaining shall be paid over " to the plaintiff.

The trial court found, in substance, (1) that the plaintiff actually expended upon the contracts turned over to the defendant the guaranteed sum; (2) that rightfully included in this sum were two sums expended by the plaintiff in procuring said contracts, namely, one amounting to $32,736.63, called "contracting expense," and the other amounting to $13,026, entered in plaintiff's books under the heads of "Pool," "Loop," "L," "S," or "Special," as is hereinafter more fully explained; (3) that the defendant "netted" from the contracts turned over to it "a much greater sum than fifteen per cent. of the total shop cost of performing the same"; (4) that the defendant owed to the plaintiff the sum of $30,568.29 (being ten per cent. of said guaranteed sum), with interest.

The errors assigned are four in number. The fourth relates to the refusal of the court below to amend the record as re-

quested; but inasmuch as we think that the questions of law raised by the first three reasons of appeal are fairly presented upon the record as it stands, it will be unnecessary to consider the fourth assignment. The other assignments will be considered in their order.

The first alleges that the trial court erred in including in the guaranteed sum the amount called "contracting expenses." The material facts bearing upon this question are the following : Under each of the contracts assumed by the defendant, the plaintiff had charged in the guaranteed sum a certain sum as "contracting expense." This expense was the ordinary expense incurred by the plaintiff in obtaining those contracts. It includes, mainly, the salary and traveling expenses of the agent who procured them, while engaged in procuring them, and the ordinary expenses of the engineers in the estimating department, while engaged in making an estimate upon them. Such expense cannot ordinarily be well distributed to each individual contract "except by an average per cent." It was the rule of the plaintiff, adopted after years of experience had shown them that it led to substantially correct results, to allow as "contracting expense" five per cent. of the amount of the contract obtained. That rule was followed by the plaintiff in the case of the contracts turned over to the defendant. No detailed items of such contracting expense were put in evidence in the court below. In the case of each of the contracts turned over to the defendant the contracting expense thereon, estimated in the manner above indicated, was entered in the cost books of the plaintiff at the time the contract was obtained. No testimony was offered tending to show that such charge was improper or excessive. "Testimony of officers of the plaintiff company having long experience in its business and full knowledge of the cost of its work and expenses in all its departments, and expert in manufacturing methods and business, was admitted, tending to show the propriety and necessity of charging such contracting expenses as above stated, by a general average, and the substantial correctness of the charge made, and that the average ordinary expense of selling or

procuring its contracts for a long series of years prior to the date of the turning over of the contracts in question to the defendant was five per cent. of the contract prices. Upon all the evidence adduced, being of the tendency above stated, whether of officers or others, it is found by the court that the sum of $32,736.63 had been actually expended by the plaintiff upon the contracts turned over to the defendant, for the ordinary expenses " of procuring the contracts.

Upon these facts the defendant claimed that as it was only liable under contracts *B* and *C* to repay the plaintiff the amounts which the plaintiff proved it had " actually expended in the part performance of said contracts," the " mere charge of a percentage of five per cent. on the amount to be paid for their performance, ascertained merely from an experience of witnesses, was not sufficient legal evidence that said amounts had been really or actually expended on such performance, and that such sums should not be included in the aforesaid " guaranteed sum.

As we understand this contention it appears to be based upon two claims : (1) that the defendant, upon the contracts turned over to it, had agreed to repay to the plaintiff only the expenditures actually made by the plaintiff " in the part performance of said contracts," and not those made by the plaintiff in procuring them ; (2) that the facts found did not warrant the court below in holding that the " contracting expense " was money actually expended upon said contracts, within the meaning of contracts *B* and *C*.

We think that neither claim is well founded. The first claim is based upon the contention that the defendant in contracts *B* and *C* has agreed, not to repay the amount of expenditures actually made upon the contracts taken over, but only to repay the amount of expenditures actually made by the plaintiff in part performance of said contracts, a very different proposition.

The construction here contended for is not, we think, the true one. It limits the amount to be repaid to expenditures of a particular kind, when the agreement itself contains no such limitation. The agreement provides for the repayment of all

actual expenditures. When the agreement was made, the "contracting expense" objected to stood charged on the plaintiff's books, and subject to the inspection of the defendant, as a part of the expenditures actually made upon the contracts taken over; it was just as much an expenditure actually made upon said contracts as were the sums expended in part performance of them; and we think that when the defendant agreed to take the benefit of the contracts, and to repay the amount actually expended upon them, he agreed to repay the sums actually expended in procuring said contracts.

As to the second claim, we think the record fails to show that the trial court erred in its conclusion that the contracting expense was "an expenditure actually made" by the plaintiff upon the contracts turned over, within the meaning of contracts $B$ and $C$. It is found, in effect, that an expense of the nature indicated by the finding was in fact incurred in procuring the contracts; that the method adopted to ascertain the amount of such actual expense was a proper and necessary one; and that by that method such amount could be ascertained with reasonable certainty. We think the conclusions of the trial court upon this part of the case, whether regarded as conclusions of law or of fact, are fully warranted by the record.

The second assignment alleges that the trial court erred in holding that the amounts charged in the guaranteed sum as "Pool," "Loop," "L," "S," or "Special," were properly so chargeable.

The facts found bearing upon the questions involved in this reason of appeal are these: The terms "Pool," "Loop," "L," and "S," have the same meaning. As annexed to certain of the contracts turned over to the defendant, those terms meant that an actual expenditure in procuring those contracts was incurred by the plaintiff under the following circumstances: The plaintiff and other corporations put in bids for said contracts, and it was agreed by all the bidders, including the plaintiff, that the successful bidder should pay to the unsuccessful bidders a certain part of the profits which it was estimated the successful bidder might receive from

the completion of the contract. The bids were made in view of such an agreement. In all the contracts turned over to the defendant, with which the above terms are connected, the plaintiff was the successful bidder, and in pursuance of said agreement paid to the unsuccessful bidders a sum total of $12,091, as set forth in detail in a schedule appearing in the record, and charged the same as part of said guaranteed sum, and this was allowed by the trial court.

As the legal validity of the above-mentioned agreement between the plaintiff and other bidders upon contracts is not questioned by either party, we will, for the purposes of this case, assume that said agreement was a valid one.

The term " Special " meant that the agent in procuring a contract had incurred some unusual expenses in so doing, which the plaintiff had paid. In procuring some of the contracts taken over by the defendant, the plaintiff had paid and charged, as " Special," expenses amounting to $1,035. This was charged in the guaranteed sum and allowed by the court below.

These expenditures, like the contracting expense hereinbefore referred to, were a part of the price the plaintiff had actually paid for the contracts turned over to the defendant, which expenditures presumably would have been repaid to the plaintiff, had it completed the contracts, by the profits arising from such performance. The defendant has taken the benefit of all these contracts, and it knew or might have known, before it assumed them, just what the plaintiff had actually expended upon them up to May 12th, 1900, and it agreed to repay such expenditure. Upon the facts found, and upon the construction hereinbefore put upon contracts B and C, we think the trial court was justified in holding that the sums last above-mentioned were properly chargeable in said guaranteed sum.

In the remaining reason of appeal it is alleged, in substance, that the trial court erred in its construction of the phrase "shop cost" as it occurs in contracts A, B, and C, in the guaranty of profits.

To understand the claim of the defendant and the ruling

of the court below thereon, upon this part of the case, it is necessary to state the substance of some part of the facts found. Prior to entering into contracts *A*, *B*, and *C*, the plaintiff had works of its own at East Berlin in this State, and had also begun to establish works in Pennsylvania, and by .said contracts these works in both States were to be turned over to the defendant. Prior also to May, 1900, the plaintiff, in order to enable it to perform the uncompleted contracts subsequently assumed by the defendant, had made subcontracts with other parties, having works of their own, to furnish and prepare material and to perform labor necessary to be done in performing the uncompleted contracts assumed by the defendant, all of which materials, whether work was done upon them or not, were to be sent directly to the places where the uncompleted contracts were to be performed. It was under such circumstances that the plaintiff guaranteed to the defendant that the transferred contracts would net to the defendant a certain profit of the shop cost of performing them. In contract *A* the guaranty is upon " the total shop cost," in contract *B* it is upon the " shop cost," while in contract *C* it is upon " the total shop cost as guaranteed " in contract *B*. The parties themselves have in contract *B* agreed upon the meaning of the words " shop cost," as used in said three contracts. They there say that " the term ʻ shop cost ʼ shall include labor, material, and general shop expense f. o. b. cars at works of party of the first part," *i. e.* of the plaintiff.

The defendant claimed that under the head of " shop cost," as used in these three contracts, " shipments of structural iron and steel work direct from mills to sites of erection, and also all subcontracts, for carrying out the transferred contracts, should be included in determining the amount of shop cost of the contracts transferred . . . to the defendant ; and that the expression ʻ f. o. b. cars at works of the party of the first part ʼ was to be considered as a provision that freight was not to be included in shop cost." The trial court overruled this claim and held, in effect, that "shop cost," as used in these three contracts, meant shop cost

only at the works of the plaintiff in this State and in Pennsylvania, and not at the works of other parties.

We think this ruling was correct. The parties themselves have said what " shop cost " should mean, and we see no good reason why that meaning should not prevail. In plain terms they limit that meaning to shop cost at the works of the plaintiff, and not elsewhere. Doubtless their definition greatly narrows the meaning which the words " shop cost," or " total shop cost," would bear in the absence of such definition ; but they had the right to adopt such a definition, and having done so they are bound by it.

There is no error.

In this opinion the other judges concurred.